

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00341-CR
_____

PATRICK BIRCH CALVERT, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 43rd District Court
Parker County, Texas
Trial Court No. CR16-0801

---

Before Sudderth, C.J.; Kerr and Wallach, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

## I. Introduction

A jury found Appellant Patrick Birch Calvert guilty of engaging in organized crime (theft in an aggregated amount between $30,000 and $150,000) and assessed as his punishment a twenty-five-year sentence and a $10,000 fine. *See* Tex. Penal Code Ann. § 12.42 (enhanced punishment), § 31.03 (theft), § 71.02(a)(1) (engaging in organized crime). In nine points,[1] Calvert, proceeding pro se,[2] appeals, arguing that he received ineffective assistance of counsel before, during, and after trial; that he was subjected to judicial bias, prosecutorial misconduct, and jury charge error; that his jury was tainted; that he was denied his right to a speedy trial; that the trial court

---

[1]Most, if not all, of Calvert's points are multifarious, i.e., they embrace more than one specific ground. By combining more than one contention in a single point, an appellant risks rejection on the ground that nothing is presented for review. *Smith v. State*, 316 S.W.3d 688, 694 (Tex. App.—Fort Worth 2010, pet. ref'd). But because we may address a multifarious point that is sufficiently developed in the brief, *see id.*, to the extent that we can discern Calvert's contentions on appeal, in the interest of resolving the substantive issues, we have addressed them below. To the extent that we cannot discern his contentions, we overrule the arguments as multifarious and inadequately briefed. *See id.*; *see also* Tex. R. App. P. 38.1(f) (requiring a brief to concisely state all points presented for review), (i) (requiring a brief to contain a clear and concise argument for the contentions made).

[2]During the appeal's pendency, we abated the case for the trial court to admonish Calvert of the dangers and disadvantages of self-representation in accordance with *Faretta v. California*, 422 U.S. 806, 835, 95 S. Ct. 2525, 2541 (1975), and *Hubbard v. State*, 739 S.W.2d 341, 345 (Tex. Crim. App. 1987).

erroneously admitted extraneous offense evidence; and that the evidence is insufficient to support his conviction.[3] We affirm.

## II. Sufficiency

In his ninth point,[4] Calvert argues that the evidence is insufficient to support his conviction for engaging in organized criminal activity.

### A. Standard of Review and Applicable Law

Federal due process requires that the State prove beyond a reasonable doubt every element of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 2787 (1979); *see* U.S. Const. amend. XIV. Accordingly, in our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential

---

[3]Calvert also proposes that this court issue some findings of fact and conclusions of law, but this is not the appropriate court for such a request. *See Zuniga v. State*, 144 S.W.3d 477, 482 (Tex. Crim. App. 2004) (stating that the appellate court is not allowed to "find" facts), *overruled on other grounds by Watson v. State*, 204 S.W.3d 404 (Tex. Crim. App. 2006).

[4]We begin with Calvert's challenge to the sufficiency of the evidence to support his conviction because a resolution of this point in his favor would result in the greatest relief. *See, e.g., Lovett v. State*, 523 S.W.3d 342, 349 (Tex. App.—Fort Worth 2017, pet. ref'd) (rendering a judgment of acquittal on one of the appellant's convictions when evidence was insufficient to support it).

elements beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017).[5]

This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622. We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Murray*, 457 S.W.3d at 448–49. When performing a sufficiency review, we must consider all the evidence admitted at trial, even if it was improperly admitted. *Jenkins*

---

[5]The *Jackson* standard of review is the "only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (overruling *Clewis v. State*, 922 S.W.2d 126 (Tex. Crim. App. 1996)).

*v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016); *Moff v. State*, 131 S.W.3d 485, 489–90 (Tex. Crim. App. 2004).

Calvert was charged with engaging in organized criminal activity with several others by having unlawfully appropriated four trailers and three vehicles,[6] alleged to have been part of one scheme or continuing course of conduct resulting in the theft of an aggregate value of $30,000 to $150,000 in property.[7] Accordingly, the State had the burden to prove that Calvert had unlawfully appropriated these items with the intent to establish, maintain, or participate in a combination, or in the profits of a combination, consisting of "Charles Brian Perrin, Chance Wayne Stephenson, Eric Ian Sampley, Cody Alan Jacobson, Amanda Michelle Morgan, and/or Mark Bates, who collaborated in carrying on said criminal activity." *See* Tex. Penal Code Ann. § 71.02(a)(1). Appropriation is unlawful if, among other things, it is without the

---

[6]The three vehicles alleged to have been stolen were a 2015 Ford F-550 stolen from P.C. Contractors, LLC, or John Patterson (the Ford F-550 theft); a 2014 Isuzu NPR (a semi-diesel industrial box truck) from National Shot Peening, Greg Glover, or Rickey Cummins (the Isuzu theft); and a 2014 Nissan Maxima from Randy Rosamond (the Maxima theft). The four trailers alleged to have been stolen were a 10-foot trailer from Robert Graves (the Graves theft); a welding trailer, Miller welder, and/or tools from Michael Rokus (the Rokus theft); a Wells Cargo trailer from Dwayne Barnett (the Barnett theft); and a PJ flatbed trailer from Sidney Whitener (the Whitener theft).

[7]The indictment originally alleged an aggregate amount of between $150,000 and $300,000, but during trial, the trial court allowed the State to amend the aggregate amount to between $30,000 and $150,000. Because Calvert does not dispute the sufficiency of the evidence to support the stolen items' value, we will not address it other than to note that the amount is supported by the record.

5

owner's effective consent or if the property is stolen and the actor appropriates it knowing that it was stolen by another. *See id.* § 31.03(a), (b)(1)–(2).

Perrin, Stephenson, Sampley, and Morgan, who were listed in the indictment as accomplices, testified during Calvert's trial. Accomplice-witness testimony must be corroborated to be sufficient for a conviction. Tex. Code Crim. Proc. Ann. art. 38.14; *State v. Ambrose*, 487 S.W.3d 587, 593 (Tex. Crim. App. 2016). We do not, however, use the *Jackson* standard when determining if accomplice-witness testimony is sufficiently corroborated. *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008) (explaining that the statutorily imposed accomplice-witness review "is not derived from federal or state constitutional principles that define . . . sufficiency standards"). When evaluating the sufficiency of corroboration evidence under the accomplice-witness rule, we "eliminate the accomplice testimony from consideration and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the crime." *Id.*; *Qualls v. State*, 547 S.W.3d 663, 671 (Tex. App.—Fort Worth 2018, pet. ref'd). To meet the requirements of the rule, the corroborating evidence need not prove the defendant's guilt beyond a reasonable doubt by itself. *Malone*, 253 S.W.3d at 257; *Qualls*, 547 S.W.3d at 671. Nor is it necessary for the corroborating evidence to directly link the accused to the commission of the offense. *Ambrose*, 487 S.W.3d at 593; *Cathey v. State*, 992 S.W.2d 460, 462 (Tex. Crim. App. 1999). Rather, the direct or circumstantial corroborating evidence must show that rational jurors could have found that it sufficiently tended to

6

connect the accused to the offense. *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011); *Simmons v. State*, 282 S.W.3d 504, 508 (Tex. Crim. App. 2009); *Qualls*, 547 S.W.3d at 671.

We judge the sufficiency of nonaccomplice evidence according to the particular facts and circumstances of each case. *Smith*, 332 S.W.3d at 442; *Malone*, 253 S.W.3d at 257. Circumstances that are apparently insignificant may constitute sufficient evidence of corroboration. *Trevino v. State*, 991 S.W.2d 849, 852 (Tex. Crim. App. 1999); *Qualls*, 547 S.W.3d at 671; *Simmons v. State*, 205 S.W.3d 65, 73 (Tex. App.—Fort Worth 2006, no pet.). We do not construe the nonaccomplice evidence de novo but instead defer to the factfinder's resolutions. *Smith*, 332 S.W.3d at 442; *Qualls*, 547 S.W.3d at 671.

## B. Corroboration Evidence

A crime spree between Thanksgiving 2015 and February 2016 led Parker County Sheriff's Office Investigators Evan Cox and Scott Masters to set up a "bait" trailer with GPS trackers. Perrin took the bait but abandoned it and fled the scene. Sampley, who was found with it, was arrested on an outstanding warrant, and he led the officers to 409 Longhorn, where Calvert lived in a trailer.

409 Longhorn Trail was owned by 67-year-old Roger Huebner, a licensed addiction therapist and Army veteran who also had a residence there. Huebner described Morgan as "difficult" and untrustworthy and said that she had lived with

7

Calvert for a while and that Ronnie Hooper, another of Calvert's companions, had moved in with Calvert for a week or two "before all this started."

Huebner testified that with all of the cars, trailers, and tools around, the property had "ended up looking like a construction site" because of Calvert and the people he was working with. He noted that Calvert had lost his "formal" job before Christmas in 2015 and had started losing weight. Huebner said that with regard to his experience as an addiction therapist, he "would say there was [an] indication that [Calvert] was drinking or using or doing" drugs but that he never saw or smelled anything.

Huebner gave Investigators Cox and Masters his consent to search the property but not the residences. The investigators interviewed Calvert the next day.

During Calvert's recorded interview, which was admitted into evidence and published to the jury, he denied stealing anything and told the investigators that in the preceding three or four months, he had sold four or five trailers but had kept no record of his sales. He brought a shoebox full of receipts to his interview. Several of the receipts were admitted separately into evidence as exhibits. Investigator Cox expressed his concerns about their legitimacy, stating, "I have never seen bills of sale written on wrinkled-up pieces of paper or napkins, or bills of sale written like the bills

8

of sale that he furnished us that day." The shoebox containing the remaining receipts was admitted into evidence as State's Exhibit 2.[8]

_____

[8]Calvert's arguments frequently allude to valuable exonerative evidence contained within the shoebox but not the specifics of its contents:

- a handwritten bill of sale, dated February 9, 2016, stating, "I Doug Hull sold Patrick a trailer house axel with small hub for $50.00";

- an undated handwritten bill of sale from Angela Littlepage, stating, "Action Wrecker sold a homemade trailer to Patrick Calvert for $200";

- a December 7, 2015 handwritten bill of sale for saddle blankets, saddle pads, a horse trough, some lug axles, and other items from Manuel Herrera to Calvert;

- many receipts for tools and work equipment from various stores, in amounts ranging from a couple of dollars to almost $500, and dated in 2014 and 2015, including:

  o 26 Home Depot receipts for the purchase of items that included a "Husky 50-Gal Mobile Job Box" for $64.00; a "4 Gal Wheeled Stack Tank Compressor" and various hoses and gauges for $220.27; a "Milwaukee 18V 1-Hand Recip Saw Kit" for $215.42; two "M18 Drikll/Hackzall Combo Kits"—one for $193.77 and the other for $161.29—a "SDS Max Rotary Hammer" and "Bosch HS1935 RTEC Flat Chisel Sharp" for $449.25; a "Framer A- PC 3-1/2' RND HEAD FRAME NLR" for $199; and a "Circ Saw A 15A 7-1/4 inch 'Tilt-Lok' circle saw" for $139.64, in addition to paint, PVC pipes, tape, nails, and clamps;

  o a receipt for $16.73 from Texas Tool Traders for "Fire Resistant hard" and "Tape Measurement H";

  o several receipts from Tractor Supply Co: $8.65 for a "7 in Johnny Square Pro Alumni Rafter SQ"; $357.21 for "Trav 10000lb Truck Winch"; $49.07 for "bottle jack 8T," "BX Lock & Keys," and "Bulldog Crank Handle," and $16.30 for a metric o-ring kit, some wire brushes, and "trav brake part cleaner nonchlorine";

  o 5 receipts from Lowe's, ranging from $4.84 to $191.01 (the only recognizable tool on these receipts is a 37-piece screwdriver set for $15.97);

9

- 2 receipts from Walmart: one included the sale of an impact wrench for $99.97, and one listed a scale for $29.84 and a burner for $29.92;

- a receipt for $2.99 for "Glide-1 1/3' Nail on cushion" from Simms Lumber Co.;

- a receipt for $20.99 for a tire inflator and gauge from Pate's Hardware Inc.;

- a receipt for $14.06 for an "auto adjust water PO" from Northern Tool & Equipment Co.;

- 2 receipts from Ace Hardware, one for "$28.99 for an "Ace Osc. Sprinkler 3600"; and one for nails and a "Blade Saw 7-1/4' 24T FRMG" for $10.99;

- Receipts from Harbor Freight tools reflecting a $21.69 purchase for safety glasses, ear plugs, and work gloves, and $24.36 for funnels;

- A receipt from Shark Specialty Tools for $98.50 for a "Wright 3/4' Breaker Bar" and a "GP 21 MM Square Socket."

- an invoice to "Branch Counter Sale San Antonio Branch," in Hill Country Village, for $180.24 from Milwaukee Electric Tool Corporation for a "M18 Battery 2 Pak";

- information on a DeWalt battery charger;

- 5 receipts from O'Reilly Auto Parts for repairs to a Ford Ranger;

- 7 money order receipts;

- various receipts from Cracker Barrel, Chick-Fil-A, McDonald's, Denny's, Taco Bell, Taco Bueno, Taco Casa, Quizno's, Krispy Kreme, Panda Express, Subway, Starbucks, Firehouse Subs, Whataburger, Rosa's Café, Waffle House, Costco, Walmart, Walgreens, Brookshire's, Albertson's, other fast food restaurants, and other grocery and convenience stores for purchases of food and beverages in amounts ranging from $3.23 to $100 (for the purchase of two $50 restaurant gift cards).

- a few receipts for clothing and personal items from Walmart, JC Penney, Target, Ross Dress for Less, dollar stores, and Dickies.

Calvert told the investigators that an individual named Cody Dearman had brought him a trailer and that Dearman was friends with Manuel Herrera, whose name was on more than one of the handwritten receipts. Calvert said that he and

---

- some handwritten notes about home repairs, a "Ron Paul President 2012" bumper sticker, two movie ticket stubs, and a May 18, 2015 Texas certificate of title for a 1994 Ford Ranger registered to Calvert.

- a $75 stub for a January 30, 2014 per diem from R&L Electric Inc.;

- a law firm ad pertaining to a speeding ticket issued to Calvert;

- a receipt for $11 from the Texas Department of Public Safety for a modification Calvert had made to his driver's license;

- plan details for Calvert's cell phone;

- a printout of a June 16, 2006 photo of the eaves of a house;

- a map showing the location of Teskey's Saddle Shop;

- one United States Postal Service "Forever" stamp;

- two blank Texas Motor Vehicle Transfer Notification forms;

- a handwritten letter mailed in 2015 from an incarcerated friend;

- a Class C Weatherford Police Department citation issued to Calvert on April 4, 2014;

- a June 29, 2015 speeding citation issued to Calvert by the Fort Worth Police Department;

- a hazardous ingredients list with regard to arc welding;

- and a JC Penney temporary credit card.

11

Dearman had been friends and that he had worked for him before they had a falling out.[9] Dearman's name was on one of the handwritten bills of sale.

Investigator Cox said that Dearman—a drug user with a lengthy criminal history, including convictions for drug possession, a variety of misdemeanors, and felony assault—had previously been in a relationship with Morgan and had told him that he would be willing to do anything to avoid prison and that Calvert had been stealing trailers.

Dearman, who was not charged as an accomplice,[10] denied his involvement when the investigators spoke with him although he told the investigators that he had taken trailers to Calvert's property. While Calvert told the investigators that Dearman had been in prison with Herrera, Dearman denied knowing anyone named "Manny," "Manuel Salazar," or "Manuel Herrera."[11] Dearman knew Sampley because they had been incarcerated together in 2006, and he had hung out with Stephenson. Dearman said that he met Perrin through Calvert and knew Morgan as Calvert's girlfriend.

---

[9]Dearman testified that he had employed Calvert briefly and summarized their employment problem as, "I was more about doing drugs and chasing women, and he was more about doing drugs and hooking up trailers." Dearman clarified that by "hooking up," he meant "stealing." He also testified that he had supplied Calvert with methamphetamine, which they had used together.

[10]Dearman testified in jail clothes because at the time of the trial he was serving a three-year sentence for unlawful possession of a firearm by a felon.

[11]In his interview with the investigators, Calvert used the names Manuel Herrera and Manuel Salazar interchangeably.

Even after Dearman and Calvert stopped socializing, Dearman continued to sell drugs to Calvert.

During his interview, Calvert denied knowing Perrin, but a search of Perrin's phone revealed text messages and calls to and from "Patrick" and "Pat" regarding Pat's sale of an engine for $3,000, the availability of drugs, and the exchange of photographs, and there were audio files on Calvert's phone from the number listed on Perrin's phone as "Patrick" and "Pat." Perrin's phone contained a text to "Patrick" with an attached list entitled "inventory," which listed a number of items, including binoculars, a tripod, and some guns. Perrin's phone also showed that on February 23, 2016, at 3:44 p.m., Stephenson had sent Perrin a "friend" request.

When Investigators Cox and Masters searched the inside of Calvert's home, among other items,[12] they found three full sets of vehicle identification number (VIN)

---

[12]After Calvert's counsel objected to extraneous offense testimony about a photograph of a Snap-On battery charger that was stolen during one of the thefts, the trial court granted a running objection to State's Exhibits 3 through 36 for any conduct that was not contained within the indictment. In addition to the stolen Snap-On battery charger, the investigators who searched Calvert's home also found a Dewalt router that they suspected was stolen because its identifying information had been removed and because one of the trailers that was stolen had previously had a Dewalt router. They also found a red bag containing battery-powered hand tools, including two sets of Milwaukee drills and impact drivers; a Bose amplifier; a winch from which the serial number had been removed; a Skilsaw with no marks or serial numbers on it; another router from which the serial numbers had been removed; and some Milwaukee battery chargers and batteries. Investigator Cox stated that he believed Calvert, who worked as a handyman or carpenter, had legally purchased some of the tools found in his residence, but Investigator Masters said on cross-examination that no one had gone through Calvert's shoebox of receipts to determine whether the items found in Calvert's residence were stolen.

13

punch sets, which are "used for punching VIN numbers or making [one's] own identification numbers onto metal." They also found a "Slim Jim," which is a piece of equipment used to enter locked cars, and various torches and air tanks on the property.

Calvert was arrested the same day his residence was searched, and Morgan visited him at the jail. During their visit, their conversation was recorded. In the recorded conversation, Calvert told Morgan that if she was going to take over "out there," she was going to have to take the lead position, and he told her to stay "on top of everything." Calvert told her to tell "Cody and everybody" to enjoy it while they can "because it won't last forever." Calvert also told her that he did not believe that "Charles" (Perrin's first name) was "singing like a canary," that he wanted Hooper to take care of "you know," and that she should check the oil on the truck.

From Calvert and Morgan's conversation, Investigator Masters learned of an additional physical location—"the Hill"—and a virtual location—Calvert's Offer Up webpage—where he suspected stolen items might be found. Investigator Masters said that the Hill was a field in the 400 block of Mesa Trail with a bunch of trees

---

The investigators found a Ryobi saw matching the description of an item stolen in an unrelated theft. In Calvert's locked "tool room," the investigators found a green trunk, from which someone had removed the previous owner's name, along with various glues and sealant. They could not identify whether the green trunk's contents were stolen or rightfully possessed by Calvert. Other items that they could not identify as stolen or rightfully possessed by Calvert included a teal box with a Mikita saw, a camera case containing a camera and some lenses, another Dewalt drill missing its serial numbers, and a Husky dual tank air compressor.

preventing sight from the road; it was located approximately three miles from 409 Longhorn Trail (Calvert's residence) and not far from 234 Pioneer Trail, where Jimbo "Duck" Adkins lived and additional stolen property was found.

### 1. The Isuzu Truck Theft

On November 24, 2015, an Isuzu truck with a Morgan dry-freight trailer cargo box was stolen from National Shot Peening (NSP) in Weatherford.[13]  Cummins, NSP's quality manager and director of maintenance, testified that Sampley, who had been an NSP employee at the time, had stolen the Isuzu truck.[14]  Sampley told authorities that Jacobson, who also worked for NSP at the time, had stolen the Isuzu truck.

During the search of Calvert's residence, investigators found underneath his trailer an Isuzu steering column that Investigator Masters believed belonged to NSP's stolen Isuzu truck.

---

[13]The facility's surveillance video showed two men in dark clothing—neither of whom was Calvert—enter the facility at around 7:34 p.m.  One of them drove the Isuzu truck into the building at around 9:19 p.m. and then drove it away at 10:15 p.m.

[14]Cummins testified that in addition to the new Isuzu truck, the thieves stole various tools and new equipment, that witnesses had placed Sampley at the scene, and that the GPS data from the company truck that Sampley drove showed that he had arrived at the scene around the time of the break-in.  Cummins said that Sampley had given the key to the building to the other culprit.  The keys to the Isuzu truck had been inside the facility.  Sampley had also been fraudulently purchasing tools and services using NSP's account.  NSP ultimately terminated Sampley, a methamphetamine and heroin user with a lengthy criminal history, for refusing to take a drug test.

Dearman identified a piece of a box truck that he had seen "down there on the bottom of Western Lake Estates by the pond." He recounted that Morgan and Calvert had borrowed his truck "to go get a box truck in White Settlement."

When the investigators searched 234 Pioneer Trail (Adkins's property), they found a Morgan dry-freight box and a partially burned label on the ground that bore the last 10 digits of the freight box's VIN. Investigator Masters contacted the Morgan dry-freight company for the full VIN and identified it as belonging to NSP's Isuzu truck. Investigators also found the Isuzu truck's rear axle and gas tank on the property.

The investigators cut the lock off the freight box and found inside the box the Isuzu truck's doors and parts of its air-conditioning system, as well as two water bottles and two cigarette butts. The bottles and cigarette butts were tested for DNA, and Calvert's DNA matched the single-source DNA profile on the menthol cigarette butt.

The search of Calvert's phone revealed three photos showing different views of the dry-freight box and the Isuzu truck's rear axle. Calvert's phone also contained information that Offer Up, eBay, and Craigslist had sent to him. Calvert's phone contained a Craigslist post, "Bumper 2014 Isuzu N series hd truck," timestamped February 14, 2016, at 10:25 a.m. Calvert joined Offer Up on February 18, 2016, when

16

he listed a 16-foot truck box for $3,500.[15] On February 22, 2016, Calvert downloaded onto his phone some files on the installation body and specifications for an Isuzu NPR truck. On February 19, 2016, eBay sent Calvert automatic relisting information for the following items: "2014 Isuzu N Series npr ecomax factory stereo" at 7:15 p.m., "2014 Isuzu N series Nor driverside headlight" at 7:19 p.m., and "2014 Isuzu NPR N series heavy duty truck dashboard front panel" at 7:22 p.m.

There was also evidence that Calvert had worked through others to post items for sale. Jimmie Young, who had a business buying and selling items online on Craigslist and Offer Up, told the investigators that he could show them photos of items from Calvert.[16] A search of Young's residence revealed an Isuzu engine, transmission, and front axle.

### 2. The Barnett Theft

On November 28, 2015, Barnett reported the theft of his Wells Cargo trailer to the Graham Police Department. During the search of 409 Longhorn Trail, investigators noticed a Wells Cargo trailer from which the main and secondary VIN

---

[15]Calvert also listed on his Offer Up page a small batch concrete mixer; 19-inch Nissan rims; a Stihl MS250 chain saw; and a 9 x 5 dump trailer.

[16]Young, who was not charged as an accomplice, testified that Calvert found a job for him after they had met at an Alcoholics Anonymous meeting in 2014 but that they had stopped hanging out after they had a "little fallout" about work. At the end of 2015, he and Calvert had used drugs together. Young said that Calvert had brought him a lawnmower, a weed eater, and a trailer to sell but that he did not know if they were stolen. Young had some drug convictions, and at the time of the trial, he had been on parole for six months.

numbers had been removed and which was being painted even though it looked relatively new. After contacting Wells Cargo, Investigator Masters confirmed that the trailer was Barnett's.

Investigator Cox testified that the handwritten bill of sale produced by Calvert during his interview described the Wells Cargo trailer:

Bill of Sale 10/17/2015

Sold to Patrick Calvert: (1) 5 x 12 enclosed trailer for 1100$ -

Title to be mailed in 45 days.

Seller: Manuel Herrera

Buyer: Patrick Calvert.

The bill of sale's date predated the trailer's November 2015 theft.

Dearman testified that Bates[17] had dropped off the Wells Cargo trailer for Calvert at Dearman's house and that Dearman had taken the trailer to Calvert's residence when he suspected that the trailer might be "hot."

### 3. The Maxima Theft

On December 21, 2015, Rosamond, who owned a repair shop on Jacksboro Highway, reported a break-in to the Parker County Sheriff's Office. A Nissan Maxima that Rosamond had been repairing for a customer had been stolen, along with a Snap-On battery charger; an air compressor; and some tools, including a wire

---

[17]On cross-examination, Investigator Cox said that he had not interviewed Bates.

welder and a Craftsman impact kit, a Snap-On drill, and some tires and rims.[18] Rosamond had fired Stephenson about two weeks before the break-in.

The investigators interviewed Stephenson, who had worked for Investigator Cox as a trustee at animal control years before. Investigator Cox testified that Stephenson had admitted to stealing the Maxima from his former employer and that he told them that Calvert had asked for the Maxima to be stolen.

The search of Calvert's phone revealed three photos of Nissan Maxima wheels. A February 24, 2016 message on Calvert's phone from Offer Up stated, "Patrick Calvert, Rate your experience selling 19 inch NISSAN rims!" When Investigator Masters went to the Hill, he found the stolen Maxima, along with "several trailers that were chopped up" and the cab to something that was covered with a tarp.

### 4. The Rokus Theft

On December 28, 2015, someone stole welding equipment, tools, and a homemade red trailer from Rokus, a self-employed welder. It had snowed the night before, and Rokus had drawn his wife's attention to the footprints and tracks in their driveway the next morning before he noticed that his property had been stolen.[19]

---

[18]The battery charger and air compressor were found during the search of Calvert's home.

[19]Perrin admitted to the Rokus theft. Rokus ultimately recovered some of his property—a chain saw, a Ryobi battery charger, one of his batteries, his torch hose, his cutting head, and two oxygen bottles—but he recovered none of his Snap-On tools. His Stihl saw was returned, as was his welder, but his trailer had been "cut up into little bitty 3-foot pieces."

Investigators found Rokus's oxygen tank during the exterior search of 409 Longhorn Trail.

Investigator Cox testified that Calvert produced a handwritten bill of sale that described Rokus's welding trailer:

Item sold: Welding Trailer w/ Rig 3 Bottles.

Description: Approx 14 ft 10 inch, red colored, welding trailer w/ 15 inch tires single axle. Trailer is homemade and has no plates. Trailer has (1) Miller Bobcat 225 Welder w/ leads. Trailer has (3) Bottles (2 oxygen, 1 acetylene) and approx. 100 ft of hose w/ torch tips. Trailer has 3 tool boxes w/ various hand tools and welding gear. Trailer and contents are sold in an AS-IS condition.

Price: $1,250.

The bill of sale was signed by "Larry Mendez" as the seller and Calvert as the buyer and was dated December 28, 2015, the same day that the listed items were stolen from Rokus. Investigator Cox said that Mendez, the purported seller, never came forward to explain the legitimate acquisition of the items and that the trailer was located on the Hill, while the welder was found on Graves's trailer at Adkins's residence. The search of Calvert's phone revealed, among other things, a photo of the toolbox from Rokus's welding trailer.

Dearman testified that he had refused to let Perrin leave a red welding trailer with a $10,000 welder at his house around Christmas, but he did not know what Perrin had done with the trailer.

5. **The Graves Theft**

20

On January 20, 2016, Robert Graves reported the theft of his custom trailer.[20] During the exterior search of 409 Longhorn Trail, investigators identified the gate of Graves's trailer.

When police interviewed Calvert, he produced a handwritten bill of sale, which Investigator Cox testified described Graves's trailer:

Bill of Sale Friday 1/29/16

Item Sold: 10 x 6, wood deck, flat bed, handmade, angle iron trailer.

Price: $750.00.

Trailer is single axle (5 lug).

Trailer sold w/ un-attached expanded metal cargo ramp.

*Trailer is painted primer/black P.C.  M.H.

Seller, Manuel Herrera, DL [xxxxxx],[21] 1/29/2016

Buyer, Patrick Calvert, Driver's License #[xxxxxx], Jan. 29th 2016.

During the interview, Calvert denied having bought Graves's custom trailer or that his bill of sale described it despite its gate being found at 409 Longhorn Trail. Investigator Cox said that Graves's trailer was found at Adkins's residence.

6.  **The Whitener Theft**

---

[20]Perrin admitted to the Graves theft.

[21]Investigator Cox ran Herrera's purported driver's license number but nothing came up.

On January 30, 2016, Whitener reported the theft of his trailer.[22] During the exterior search of 409 Longhorn Trail, the investigators located Whitener's trailer, which they identified using the last six digits of the VIN on the trailer's gooseneck.

Deputy Cox testified that Calvert's handwritten bill of sale dated November 19, 2015 described Whitener's trailer:

Date: 11/19/15.

Sold: 20 ft flat bed trailer w/ [unreadable] sides.

Sold in AS IS condition.

Price: Traded for Craftsman Toolbox w/ automotive tools.

Seller: Cody Dearman 817-751-[xxxx].

Buyer: Patrick Calvert, 817-314-[xxxx].

## 7. The Ford F-550 Theft

The search of Calvert's phone revealed, among other things, a photo of Perrin sitting in the driver's seat of the Ford F-550 listed in the indictment.[23]

## C. Corroboration Analysis

Based on the above, rational jurors could have found that the evidence sufficiently tended to connect Calvert to the offense such that accomplice-witness

---

[22]Perrin admitted to the Whitener theft.

[23]Perrin stole the Ford F-550 on February 16, 2016—less than two weeks after he stole the bait trailer—and he told police that he had committed the crime alone.

22

testimony could be considered. *See Smith*, 332 S.W.3d at 442. That is, deferring to the factfinder's resolutions, the nonaccomplice evidence showed that:

- Sampley and Jacobson had stolen the Isuzu truck, Calvert had downloaded the vehicle's specifications onto his phone and had posted parts of it for sale on Craigslist and eBay, and Calvert's DNA was found on a cigarette butt in the truck's freight box;

- Calvert had handwritten a "bill of sale" backdated from before the date of the theft of Barnett's Wells Cargo trailer, which was found being painted outside Calvert's residence at 409 Longhorn Trail;

- Stephenson had stolen the Maxima along with other items from Rosamond's shop where he used to work and related items from that theft were found in Calvert's residence, and Calvert's phone contained photos of the vehicle's wheels and an email from Offer Up inviting him to rate the experience of selling the vehicle's rims;

- Calvert had handwritten a "bill of sale" dated the same date as the theft for Rokus's $12,800 trailer, tools, and equipment that had been stolen by Perrin, and some of these items were found on Calvert's property;

- the tailgate of Graves's custom trailer was found outside Calvert's residence at 409 Longhorn Trail;

- Calvert had handwritten a "bill of sale" matching the description of Whitener's trailer, backdated from before Perrin's theft of Whitener's trailer; and

- Calvert had a photo of Perrin in the stolen 2015 Ford F-550 on his cell phone.

## D. Accomplice Evidence

Stephenson, Perrin, Sampley, and Morgan were listed as accomplices in the indictment.

### 1. Stephenson's Testimony

23

Thirty-two-year-old Stephenson, who testified in jail clothes, had several convictions ranging from misdemeanor assault on a family member to burglary of a habitation, and his incarceration at the time of the trial was for theft of property, $30,000 to $150,000, to which he had pleaded guilty in exchange for a 15-year sentence. He met Calvert in 2015 when he went to Dearman's house to pick up some drugs, and for a short time, he had dated Calvert's daughter. He got into debt to Calvert for drugs and stole in order to pay his debt.

Stephenson said that the first thing he stole was the Maxima from Rosamond's shop. Stephenson claimed that he had been the only person involved in that burglary and that he had loaded up the Maxima with a welder, a little air compressor, a set of rims, and "just some other little tools." He had taken it to Calvert's residence on Longhorn Trail because Calvert had told him that he could not have more drugs until he paid off his $300 or $400 debt.

Stephenson met Perrin at Calvert's, and they had used drugs together two or three times, but Stephenson said that he never stole anything with Perrin. He recalled seeing someone in a little silver SUV pull a red two-wheeled trailer with a welder on it to Calvert's residence in late December or early January.

Stephenson knew Edward Roden and said that he had seen the white dry-freight box on the property where Roden lived.[24] Stephenson said that Calvert told

---

[24]Morgan testified that Roden lived with Duck, who lived at 234 Pioneer Trail.

him he would pay him to break apart the truck, so he "just tore it apart, took the cab off of it, [and] took the motor out of it." He started tearing apart the box truck in December, while he was dating Calvert's daughter, and it took him 12–15 days. He denied that he was ever part of any organized crime scheme to sell trailers or that Calvert had sent him to steal a car.

### 2. Perrin's Testimony

Perrin testified in jail clothes because at the time of Calvert's trial he was serving a seven-year sentence for possession of a controlled substance. Perrin had also pleaded guilty to engaging in organized criminal activity in exchange for seven years' confinement and his truthful testimony.

Perrin had a number of drug and burglary convictions and said that he had known Calvert, a friend of a mutual friend, since 2015 and had used methamphetamine with him a few times. Perrin testified that he never paid Calvert or gave him stolen property in exchange for drugs. He acknowledged that stolen property had ended up at 409 Longhorn Trail and said that when he was high, he stole things for the sake of stealing them and then dumped things "just random places." He claimed that he did not know what Calvert would do with the property that he had dumped and that he did not care that he never received any proceeds. Perrin said that he had sent photos to Calvert and others to brag about stuff he had stolen.

Perrin admitted that he had stolen the Ford F-550. Police searched the Ford F-550 pursuant to a warrant, and photos from the search were admitted into evidence. Inside the truck, among other things, was a Milwaukee Saws-all with the initials "PC" on it. There was also a box of power tools, some bolt cutters, a bag containing two small hand-held radios, a "Slim Jim" like the one seen at Calvert's residence, and some dark clothing; there was also a paint sprayer in the truck's bed.

Perrin admitted to stealing a trailer that had kitchen equipment on it, stating, "Yeah, I think they even got me on videotape stealing that one."[25] He also admitted to stealing a trailer from the Canyon West area—a theft that was also videotaped. He admitted to the Graves theft but said that he did not know how that trailer's tailgate had ended up at 409 Longhorn Trail. Perrin said that he had dropped off property at Calvert's when Calvert was not there to ask him any questions about it but that anything he had left at Calvert's was meant to be stored, not for Calvert to sell. He denied having gone to Pioneer Trail or to the Hill on Mesa Trail and said that Calvert had never instructed him to steal anything.

Perrin knew Sampley from his bartending days, when Sampley had been a patron. Perrin said that Sampley had nothing to do with the theft of the bait trailer and had just been there to pick up Perrin. He used heroin with Sampley. Perrin knew

---

[25]Kapil Adhikari, who owned several gas stations in Parker County, testified that he had called the Parker County Sheriff's Office on January 28, 2016, to report the theft of his black trailer, which had a "hot box for food preparation" on top of it. There was surveillance video of the theft.

Jacobson because they had worked together at a restaurant and had used drugs together. Perrin denied that they had stolen anything together. Perrin said that he had met Stephenson one time. Perrin said that Morgan was with Calvert when he had met her but that "everybody kn[ew] her" because she had a reputation for getting around.

Perrin denied that he had any agreement or intent to establish a combination with Calvert, Sampley, Jacobson, Morgan, or Bates with regard to the Ford F-550, the bait trailer, Graves's trailer, or Whitener's trailer and said that he did not know anything about the Maxima, Barnett's trailer, or the Isuzu truck.

### 3. Sampley's Testimony

Sampley was bench-warranted to the trial to testify. He had a number of drug and theft convictions, including one for theft of property under $2,500 for which he was serving a 20-year sentence at the time of the trial. Sampley said that he and Perrin had used heroin together, but he did not recall ever using any drugs with Calvert. He said that he had met Calvert once with Perrin.

Sampley claimed that he did not commit any thefts with Perrin or see Perrin commit any thefts and that although he had seen Perrin with several trailers, he had never asked Perrin where he had obtained them. Sampley said that Perrin had brought a couple of trailers by his place when he had stopped to get high but that Perrin had then taken off again with the trailers. Sampley recalled that on one snowy day, Perrin had stopped by with a trailer that had a flat tire, and Sampley had helped

27

him change it.  But he denied having helped Perrin dispose of the trailer or having helped Perrin steal it.

Sampley noted that when he saw the Maxima and the cab of the Isuzu truck, it appeared to him that Calvert and Perrin were moving those items.

Sampley denied having stolen NSP's Isuzu truck but acknowledged his friendship with Jacobson, who had worked at NSP with him.  He denied knowing Morgan or Stephenson but said that he had met Dearman in the Parker County Jail "some years back."  Sampley denied having ever entered into any kind of agreement with Calvert, Perrin, Jacobson, Bates, Morgan, or Stephenson to steal property or to sell or dispose of stolen property.

## 4. Morgan's Testimony

Morgan had prior convictions for criminal mischief (stolen checks) and manufacturing a controlled substance (methamphetamine).  She testified that in 2015 and 2016, Calvert had offered her a place to stay with "no strings."  She took him up on it because she was homeless.  Morgan claimed that she and Calvert were just friends and had used methamphetamine together.

Morgan, who had been looking for a job while she stayed with Calvert, said that Perrin had come by the house, as had Stephenson and Dearman.  She did not recall if Sampley or Young did.

When asked if she had seen the Wells Cargo trailer on the property, Morgan said yes and also said that Calvert had told her that he and a friend had gone "in on it

28

in halves." She thought it was odd that he was painting it because it appeared to be a brand new trailer and did not need a paint job. Morgan claimed that she never went with Calvert to steal trailers or to deliver trailers to others.

Morgan said that she saw trailers brought to Calvert's property but that she never saw who had left them. She did not know an individual named "Manny."

Morgan took Investigator Masters to the Hill and said that there was just a bunch of metal and a car there; she denied knowing how the car ended up there. Morgan said that Calvert had never told her why he had taken items to the Hill or to Pioneer Trail.

Morgan also gave the following testimony:

Q. (By [prosecutor]) Did Mr. Calvert ever threaten you?

A. Once.

Q. When was that?

A. It was – I'm not real sure of the date or whatever, but we got in a heated argument; and you know, he did threaten me.

Q. Was this after he got arrested or before?

A. Before.

Q. Okay. Was it regarding the things that he got arrested for?

A. He was like running -- trying to get some receipts and stuff, and he couldn't.

Q. Well, tell us about that. What do you mean: He was trying to get some receipts?

A. He was trying -- the cops told him that he needed to come up with a bill of sale for a trailer or something, and he was just trying to come up with that. And he was just, you know, hot-headed about everything.

Q. And when he was trying to come up with the receipt, was he making up a receipt? Wasn't he falsifying one?

A. I didn't see him write one out, but yes.

Q. And how do you know that? That he was trying to falsify one?

A. He was talking about it.

Morgan said that when she visited Calvert in jail, Hooper had wanted her to ask him some questions on a paper that she had held up to the window for Calvert to read. She said that she thought the questions had to do with axles and that Hooper had wanted to know what Calvert "wanted him to do with the stuff." Morgan also said that when Calvert told her that he wanted her to take the lead position, he meant for her to take care of the stolen property that he was selling and to be in charge of the organization. During the conversation, Morgan told Calvert that Hooper had told Duck—Adkins's nickname—to get rid of the box if he could for $500, to keep $200, and to give her and Calvert the rest.

Morgan explained that Duck had the trailer house where the Morgan dry-freight box was located. Roden, who lived with Duck, was someone Morgan had known for a very long time. Morgan said that she was sure Calvert had known that the goods were stolen and that he was the ringleader, and in their recorded

30

conversation, she told him that someone in Johnson County had said that "Charles" (Perrin's first name) was "singing like a canary."

During cross-examination, Morgan said that she did not recall who was in the criminal organization, that she had never agreed to take care of a criminal organization, and that she was not a part of one. She admitted that after she had left Calvert's house the day after their conversation at the jail, she did not take care of anything for him. Morgan acknowledged that the Hill was owned by one of her ex-boyfriends. She also acknowledged that while living with Calvert, she went to stay at her father's property on Horseshoe Bend, where Perrin had a trailer.[26] Morgan denied that she had been dating Dearman while seeing Calvert. Morgan said that she could not tell if she was the woman in a photo of the freight box.

**E. Sufficiency Analysis**

Calvert argues that the evidence is insufficient to support his conviction because the State failed to prove that he had committed one or more of the enumerated offenses with the intent to establish, maintain, or participate in a combination of named people as a prerequisite to a finding of guilt on engaging in organized criminal activity. He further argues that the State failed to prove that he was guilty under the law of parties and that "no combination was ever shown to have

---

[26]It is unclear from the record whether the "trailer" referred to by Morgan in this portion of her testimony was a residence or a trailer like the ones at issue in this case.

31

existed involving any of the people listed on the indictment." Calvert asserts that there was no evidence showing that he had stolen any of the property, had helped anyone steal the property, or had directed anyone else to steal the property or that he had entered into an agreement with any of the alleged combination members to engage in a course of criminal activity. We disagree.

In addition to the corroborating evidence set out above that tied Calvert to the seven thefts, the jury could have found that Morgan's testimony—that Calvert was the ringleader and that Calvert had falsified at least one bill of sale—applied to the thefts of the Graves, Rokus, Barnett, and Whitener trailers and showed Calvert's knowledge that the property had been stolen and his intent to establish, maintain, or participate in a combination or in the profits of a combination with, respectively, Perrin and Morgan as to the Ford F-550 and the Graves and Whitener trailers; Perrin, Stephenson, Sampley, and Morgan as to the Rokus trailer; and Bates and Morgan as to Barnett's trailer.

From Morgan's testimony and the recorded conversation that she and Calvert had at the jail, the jury could also have determined that Morgan herself knew about all of the items of property that had been stolen and that she intended to participate in the combination or the profits thereof despite her testimony that she was not involved. *See Franklin v. State*, 193 S.W.3d 616, 620 (Tex. App.—Fort Worth 2006, no pet.) ("[T]he jury is free to accept or reject any or all of the evidence of either party, and any or all of the testimony of any witness."). Perrin denied having collaborated

with Calvert, Morgan, Sampley, Jacobson, or Bates as to the Ford F-550, which he claimed that he took for his personal use only, and that the photos on his phone and on Calvert's phone were only for bragging rights, but the jury was free to disbelieve this as well. *See id.*

As to the Rokus theft, Stephenson testified that he saw someone deliver the Rokus trailer to Calvert's residence but disclaimed ever stealing anything with Perrin, who had admitted to stealing the Rokus trailer. The Rokus trailer was stolen after it had snowed, and Sampley recalled helping Perrin change a trailer tire on a snowy day but denied helping Perrin steal or dispose of the trailer. While Perrin denied any interest in profiting from stealing the trailers or that Calvert had ever instructed him to steal anything, the jury was entitled to disbelieve their denials. As Perrin had, in fact, confessed to many of the thefts, the jury could have inferred that he was the "Charles" to whom Morgan and Calvert had referred in their conversation at the jail when Morgan told Calvert that "Charles was singing like a canary."

As to Barnett's trailer, while Investigator Cox said that he had not interviewed Bates, the jury was entitled to believe Dearman's testimony that Bates had dropped the trailer off at Dearman's house for Calvert.

As to the Isuzu truck, the jury could have found that Sampley and Jacobson had stolen the vehicle either for Calvert or in collaboration with Calvert, who had left his DNA on a cigarette inside of the vehicle's box, who had paid Stephenson to help him tear it apart, who had downloaded the vehicle's specifications onto his phone,

and who had posted parts of it for sale on Craigslist and eBay. They also could have found that Perrin was involved in light of Sampley's testimony that it had appeared to him that Calvert and Perrin were moving the vehicle's cab. Although Sampley and Stephenson both denied being part of an organized crime scheme, the jury could have chosen to disbelieve this portion of their testimony, particularly in light of Morgan's testimony that Calvert was the group's ringleader.

Finally, Stephenson admitted to stealing the Maxima and other items, some of which were found in Calvert's residence, and he told Investigator Cox that Calvert had asked him to steal the Maxima although he denied having said this during his testimony at trial. The jury was entitled to believe Investigator Cox and to disbelieve Stephenson's denial. Sampley testified that it had appeared to him that Calvert and Perrin were moving the Maxima, and Calvert's phone contained photos of the vehicle's wheels and an email from Offer Up asking him to rate his experience of selling the vehicle's rims. The vehicle was found at the Hill after Calvert and Morgan's recorded jail conversation. Thus, the jury could have found that Calvert, Stephenson, Perrin, Sampley, and Morgan were involved in the Maxima's appropriation. In summary,

| Stolen Property | Accomplices |
|---|---|
| Ford F-550 | Perrin, Morgan |
| Graves's Trailer | Perrin, Morgan |
| Rokus's Trailer and Tools | Perrin, Stephenson, Sampley, Morgan |
| Barnett's Trailer | Bates, Morgan |
| Isuzu Truck | Sampley, Jacobson, Morgan, Stephenson, Perrin |

| Whitener's Trailer | Perrin, Morgan |
| Maxima | Stephenson, Sampley, Perrin, Morgan |

Because the evidence is sufficient to support Calvert's conviction for engaging in organized crime, we overrule his ninth point.

## IV. Judicial Bias

In his second point, Calvert argues that the trial judge abused his discretion by refusing to recuse himself. Although Calvert complains that he notified the judge of a conflict of interest in 2016[27] and recites various other instances that he claims showed the trial judge's personal bias against him, the record does not reflect that Calvert (or any of his numerous appointed counsel over the course of the case)[28] filed a motion to recuse. Accordingly, there is nothing before us to review, and we overrule Calvert's second point. *Cf. Gaal v. State*, 332 S.W.3d 448, 456 (Tex. Crim. App. 2011) ("An appellate court reviews an order denying a motion to recuse under an abuse of discretion standard.").

---

[27]The conflict referenced by Calvert is the trial judge's former representation of him and his mother in their respective divorces. But these are not grounds for disqualification or recusal because these civil cases were not the instant criminal "matter in controversy," *cf.* Tex. R. Civ. P. 18b(a), (b)(5), and on its face, the record does not reflect any other potential grounds for disqualification or recusal. *See* Tex. R. Civ. P. 18a(3) (stating that a motion to recuse "must not be based solely on the judge's rulings in the case"). The procedures for recusal of judges set out in Texas Rule of Civil Procedure 18a apply in criminal cases. *De Leon v. Aguilar*, 127 S.W.3d 1, 5 (Tex. Crim. App. 2004) (orig. proceeding).

[28]Calvert went through five appointed counsel during the pretrial and trial phases of this case.

## V. Speedy Trial

In part of his fourth point, Calvert complains that he was denied his right to a speedy trial and that his appointed counsel refused to file a motion for a speedy trial. But the record reflects that Calvert's second appointed counsel filed a motion for speedy trial on November 30, 2016, the same month that Calvert was indicted for the instant offense. In her motion, Calvert's then-appointed counsel recited that Calvert had been arrested on February 24, 2016; had been indicted in two other cause numbers on May 19, 2016, based on the same facts as the instant case; and had been in jail continuously since February 24, 2016.

In his reply brief, Calvert states that there was a hearing on June 20, 2018, at which his defense counsel asked for a ruling on the speedy trial issue. We supplemented the record with the June 20, 2018 hearing.

The first issue addressed at the June 20, 2018 hearing was Calvert's request for a bond reduction; his counsel noted that Calvert had been held since February 2016— "approximately 28 months." According to Calvert's counsel's recitation at the hearing, when Calvert's second appointed counsel was released from representing Calvert on September 5, 2017, the trial court pointed out to Calvert that "there would be a delay caused by this and that this is a complex case and any new attorney would need time to get up to speed" and asked Calvert if he was okay with that delay, and Calvert responded, "Yes, sir." Calvert's counsel asked the trial court for a clarification of whether this constituted a waiver of Calvert's right to a speedy trial, and the trial

36

court informed the parties that it would make a ruling "via email" that afternoon. No evidence was presented at the hearing with regard to the *Barker v. Wingo* factors. *See* 407 U.S. 514, 530, 92 S. Ct. 2182, 2192 (1979). The trial court subsequently issued an order reducing Calvert's bond the next day, but the record does not contain the ruling on Calvert's counsel's request for clarification as to the motion for speedy trial. While we may infer that the trial court either found the speedy trial complaint waived or otherwise overruled it from the fact that Calvert actually went to trial, without the presentation of evidence on the record with regard to the complaint, this point has not been preserved for our review. *See* Tex. R. App. P. 33.1(a); *Henson v. State*, 407 S.W.3d 764, 769 (Tex. Crim. App. 2013) (noting that at least two of the *Barker v. Wingo* factors—the reason for the delay and the prejudice to the accused—are fact-specific inquiries that may not be readily apparent from the trial record without a hearing). We overrule this portion of Calvert's fourth point.

## VI. Jury Selection

In his third point, Calvert complains that the jury was tainted by a conflict of interest because Ronnie Arlan Williams Jr. became a juror even after he had identified himself as the cousin of Rosamond, one of the theft victims.

During voir dire, Williams stated, "Randy Rosamond. That's my cousin," but when asked whether the fact that Rosamond was his cousin would have any bearing on his ability to be a fair and impartial juror, Williams replied, "I don't think so." After the prosecutor informed the trial court that she thought a challenge for cause

would be appropriate as to Williams because he had said that he could not consider the full range of punishment, the trial court added, "He also knows the witness, correct?" After Williams stated that he could consider the full range of punishment, the prosecutor withdrew her challenge for cause; Calvert's defense counsel asked Williams no questions and did not make a challenge for cause.

Citing *Anderson v. State*, 633 S.W.2d 851, 854 (Tex. Crim. App. [Panel Op.] 1982), the State acknowledges that bias exists as a matter of law when a prospective juror "is related to the State's primary witness" and that Williams, as a cousin of one of the witnesses in the case, was therefore arguably subject to a challenge for cause. We need not decide that issue here. As the State points out, Calvert did not raise a challenge for cause. Therefore, he failed to preserve anything for our review. *See id.* (stating that the trial court has discretion to determine whether bias exists and when a trial court overrules a challenge for cause, the decision will be reviewed in light of all of the answers the prospective juror gave). We overrule Calvert's third point.

## VII.  Extraneous Offense Evidence

In part of his fifth point,[29] Calvert complains that the trial court abused its discretion by admitting extraneous offense evidence with regard to State's Exhibits 3 through 36, a total of 41 photographs taken in Calvert's residence that showed a

---

[29]In the remainder of his fifth point, Calvert again complains that the trial judge was biased against him, which we addressed above with regard to his second point, and that the prosecutors' actions constituted prosecutorial misconduct, which we address below in conjunction with his sixth point.

variety of tools and equipment from which many had had their identifying information removed,[30] and with regard to Investigator Masters's testimony about the uncharged theft of Adhikari's trailer.

Calvert refers us to some of the following dialogue during Investigator Cox's testimony with regard to the challenged photographs; for completeness, we have added some of the conversation prior to his references:

> [Prosecutor 1]: Judge, I'm offering State's 3 through 36. I will tell the Court and Counsel a couple of these have sticky notes. I'm not offering those. I'll pull those off when I'm addressing the witness.
>
> (State's Exhibit Nos. 3–36 offered.)
>
> [Defense counsel]: I understand. No objection, Your Honor.
>
> THE COURT: 3 through – State's 3 through 36 are admitted.
>
> (State's Exhibit Nos. 3–36 admitted.)
>
> . . . .
>
> Q. All right. State's Exhibit Number 3, is there anything of significance to this picture?
>
> A. There is. There is a Snap-[O]n battery charger sitting underneath the portrait hanging on the wall that was stolen from a -- . . .

---

[30]Calvert also argues that the trial court violated Rule of Evidence 104(b), but his counsel did not raise that rule in his objections. *See* Tex. R. Evid. 104(b) ("When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist. The court may admit the proposed evidence on the condition that the proof be introduced later.").

It's a Snap-[O]n battery charger that was stolen from a burglary of a building off of 199.

Q. Anything else about these items that were --

[Defense counsel]: Objection, Your Honor.

THE COURT: I'm sorry?

[Defense counsel]: Objection.

THE COURT: What is your objection?

[Defense counsel]: *It's an extraneous conduct. It's not charged in this indictment.*

THE COURT: What do you say, [Prosecutor 1]?

[Prosecutor 1]: I think that that absolutely goes to the burden that the State has to prove an engaging, is that there's a conspiracy, that there's a plan, that there's a scheme.

[Prosecutor 2]: We should approach.

(At the Bench.)

[Defense counsel]: Once again, he's not charged with conspiracy. They could have charged in the [engaging-in-organized-crime offense] and said: And he did conspire. They didn't show conspiracy. They said he did commit these seven or eight discreet acts -- specific acts. *Everything else is uncharged misconduct.*

[Prosecutor 2]: Your Honor, going to 404, we can also prove up extraneouses [sic] if it goes to show a common scheme, which has nothing to do with whether it's a conspiracy or not. It's still a common scheme or plan. Keep in mind this is an aggregated charge. This is a continuing course of conduct.

[Prosecutor 1]: Absence of mistake. All of the laundry list that is in 404(b), which is candidly exactly what this kind of case is

40

there for because there is all this other stuff that makes up the plan.

[Defense counsel]: It is a burglary off of 199. Tarrant County, wasn't it? Is that even something I have in my discovery? I don't know.

THE COURT: The only thing I heard the witness testify to is this a -- this is a Snap-[O]n battery charger that was stolen from -- was stolen from wherever he said.

[Defense counsel]: Correct.

THE COURT: 199 or wherever. What was your objection, [Defense counsel]?

[Defense counsel]: *Objection is that's extraneous conduct*; but also, I don't know what police report I was ever provided that said there was a burglary off 199 -- of a building off 199. Now, maybe I'm wrong because I got a lot of police reports, but I'm pretty sure I'm not. *If I haven't been provided that, then I would say that my additional objection is under 39.14, and that goes against my Michael Morton Act, and so I would object to anything that I have not been provided.*

[Prosecutor 1]: Judge, while I can't say off the top of my head that he's been provided with the burglar[y] report, I can tell you that he was provided with State's Exhibit 44, which specifically lists that item.

[Defense counsel]: Well, it lists the item[] but not the context of the item.

[Prosecutor 2]: Well, and I would go further to say also nobody's accused Mr. Calvert of stealing this object.

THE COURT: Well, that's what I was going to note is that.

[Defense counsel]: But the dangerousness is -- and the reason they want it is because it's part of the continuing scheme. So then we have these items there, and they're going to say this is part of that scheme or conspiracy or whatever, and so that's

41

effectively in the minds of the jury the same thing. *That's the dangerousness of it for 403, 401.*

[Prosecutor 2]: And that's why there's a limiting instruction regarding 404(b) for that purpose.

THE COURT: If you find --

[Prosecutor 2]: Right.

[Prosecutor 1]: And also, Judge, going back to --

THE COURT: Hang on. Hang on. They're saying they're hearing the white noise as well as me. *I'm going to overrule your objection.*

[Defense counsel]: Thank you, Your Honor. *May I have a continuing objection to --*

[Prosecutor 1]: There's going to be quite a few things.

[Defense counsel]: That's what I figured.

THE COURT: That's fine.

[Prosecutor 1]: *So that will be the continuing objection between 3 and 36 with anything that wasn't contained in the indictment?*

[Defense counsel]: *Correct.*

[Prosecutor 1]: Okay.

THE COURT: *So noted.* [Emphases added.]

Calvert also refers us to the following dialogue outside the jury's presence regarding the admissibility of Investigator Masters's testimony about the theft of Adhikari's trailer:

42

THE COURT: Adhikari. [Defense counsel], your objections were that it was -- the probative value outweighed -- it's --

[Defense counsel]: *More prejudicial than it is probative, Your Honor; and it's also that it's extraneous conduct.*

THE COURT: Okay. And your response to that, [Prosecutor 2] was?

[Prosecutor 2]: Well, that extraneous conduct can come in for various reasons, that being motive, opportunity, intent, preparation, plan, knowledge, absence of mistake, common scheme; and that it is -- while it may be prejudicial, any evidence against anyone is going to be prejudicial, Your Honor. And so -- but it is also very probative in proving up these facts; and honestly, the courts have -- in the recent years, they lean more towards admitting evidence rather than excluding evidence.

THE COURT: If it wasn't probative, it would be irrelevant --

[Prosecutor 2]: That's correct, Your Honor.

THE COURT: -- or prejudicial.

[Prosecutor 2]: It could be both. It's going to be both.

THE COURT: It could be. If it wasn't prejudicial, it would be irrelevant.

[Prosecutor 2]: That's right.

THE COURT: I'll give you the last word, [Defense counsel].

[Defense counsel]: I would just say it's unfairly prejudicial. The State had every opportunity to add this charge to their indictment, to let -- actually, they charged it on a totally separate indictment. This was the[ir] choice and charging philosophy,

43

whatever that philosophy may be. That, again, they don't need this. They're not telling you that this is necessary for any purpose.

[Prosecutor 2]: Well, we told you it was necessary for the purposes I just listed.

[Defense counsel]: They haven't told you how it's necessary. They just told you it was necessary. They don't need this to make the elements of the indictment on this case. One more trailer? I think there's nine trailers on this indictment. I don't see how that's necessary. I think it's just piling on; therefore, it's unfairly prejudicial.

THE COURT: And the Court is going to overrule your objection. [Emphasis added.]

As to the photographs, Calvert complains that the trial court abused its discretion by overruling his counsel's objections to lack of notice, to extraneous offense evidence under Rule 404(b), to relevance under Rule 401, and to prejudice under Rule 403. Calvert argues that the trial court did not perform a Rule 403 balancing test, contending that the trial court did not have enough information to perform a balancing test and that its decision to admit the evidence "was made spontaneously, arbitrarily, and shows a continued pattern of disregarding due process to entertain the prosecution." He also argues that while "the erroneously admitted evidence purported to show a scheme or plan, . . . [it] really was intended to show character conformity by creating a false impression that a string of other crimes had occurred and that [Calvert] was involved."[31] And with regard to testimony about the

---

[31]Calvert also states, "Exhibits 3, 6, and 8 are pictures of items stolen by Chance Stephenson who testified to being alone when he did it. The remaining 36

44

theft of Adhikari's trailer, Calvert complains that the trial court ignored the requirements of Rules 403 and 404(b).

All errors, except federal constitutional errors labeled as "structural" by the United States Supreme Court, are subject to a harm analysis under Rule 44.2. *Jordan v. State*, 256 S.W.3d 286, 290 (Tex. Crim. App. 2008). Accordingly, assuming without deciding that the trial court abused its discretion by admitting the challenged photographs and testimony about Adhikari's trailer, and to the extent that Calvert preserved these errors,[32] we will conduct a harm analysis to determine whether reversible error occurred.

Generally, the erroneous admission or exclusion of evidence is nonconstitutional error governed by Rule 44.2(b) if the trial court's ruling merely offends the rules of evidence. *See Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); *see also Walters v. State*, 247 S.W.3d 204, 222 (Tex. Crim. App. 2007)

___

pictures show tools, the majority of which had matching receipts right there in the courtroom." We infer from that description that Calvert is referring to State's Exhibit 2, the "shoebox of receipts." However, in our review of State's Exhibit 2, we found only three receipts that *might* have matched some of the items found in Calvert's residence: a May 31, 2015 receipt for a "4 Gal wheeled stack tank compressor," an April 29, 2015 receipt for a "Milwaukee 18V 1-Hand Recip Saw Kit," and an invoice to Branch Counter Sale San Antonio Branch from Milwaukee Electric Tool Corp. for a "M18 Battery 2 Pak."

[32]Among other things, the State argues that Calvert failed to preserve these complaints because his objections were untimely (i.e., after the evidence had been admitted without objection) and because the same evidence came in without objection later in the trial. The State does not address Calvert's arguments about the theft of Adhikari's trailer.

(determining that exclusion of evidence supporting appellant's defensive theory was nonconstitutional error). *But cf. Tiede v. State*, 76 S.W.3d 13, 14 (Tex. Crim. App. 2002).[33]

Rule 44.2(b) requires us to disregard any nonconstitutional error that does not affect an appellant's substantial rights. Tex. R. App. P. 44.2(b). An error that has a "substantial and injurious effect or influence in determining the jury's verdict" affects a substantial right. *Haley v. State*, 173 S.W.3d 510, 518 (Tex. Crim. App. 2005); *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)). Conversely, an error does not affect a substantial right if we have "fair assurance that the error did not influence the jury, or had but a slight effect." *Solomon*, 49 S.W.3d at 365; *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).

In determining the likelihood that a nonconstitutional error adversely affected the jury's decision, we review the record as a whole, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case. *Motilla v. State*, 78 S.W.3d

---

[33]While Calvert complains that the trial court's evidentiary rulings violated his right to a fair trial and to due process, as reflected above in our recitation of the dialogue between counsel and the trial court, these were not grounds raised by his counsel during trial. Therefore, these complaints were not preserved for our review. *See* Tex. R. App. P. 33.1(a).

352, 355 (Tex. Crim. App. 2002). We may also consider the jury instructions, the State's theory and any defensive theories, whether the State emphasized the error, closing arguments, and even voir dire, if applicable. *Haley*, 173 S.W.3d at 518–19; *Motilla*, 78 S.W.3d at 355–56.

We have already set out a thorough review of the evidence in our factual recitation and sufficiency analysis and concluded that the evidence is sufficient to support Calvert's conviction. During voir dire, both parties discussed the elements of the offense, the burden of proof, and the jury's responsibility to judge the credibility of the witnesses. The prosecutor asked the venire panel to identify some of the ways to prove that someone knew that the property they possessed had been stolen, and the potential jurors suggested removal of serial numbers, lack of paperwork, testimony from witnesses that were present during or after the theft, and email documentation.[34]

The prosecutor's opening statement acknowledged that law enforcement had to put together the "pieces of the puzzle" to determine how the various thefts were related to Calvert for one scheme for profit, including—among other things— Calvert's shoebox of receipts and "questionable bills of sale," the stolen trailers left on property tied to Calvert, and Calvert and Morgan's recorded jail conversation. The

---

[34]The prosecutor also introduced the concept of conspiracy over defense counsel's objection that conspiracy had not been charged. The prosecutor explained, "We're just talking about just generalities and laws." The trial court overruled defense counsel's objection.

prosecutor mentioned that from the search of Calvert's residence the jury would "see lots of tools that had serial numbers, identifying information, scraped off," but she also listed surveillance videos, cell phone information, DNA evidence, and testimony from some of the thieves and the property owners as evidence connecting Calvert to the offense.

Defense counsel's opening statement focused on witness credibility, telling the jury that the State had plumbed the depths of Parker County and the prison system and had "collected what rose from the bottom, and those are the people who are going to testify in this case," including thieves, drug dealers, drug users, and a pornographer. He stated, "The State has friends in low places, and they're all going to bring them here to you . . . . That's what this case rests on, the words of a bunch of criminals." Calvert's counsel told the jury that they would not hear that Calvert had ever gone onto anyone's property and committed a theft and that they had to keep in mind the "magic number" of three to reach organized crime. He told them that Perrin would tell them that he was never compensated for the thefts he had committed when he was on drugs and that there was no agreement between him and Calvert to do so.

The jury charge defined the offense in the abstract and application paragraphs[35] but did not mention the extraneous tools or Adhikari's trailer. The charge also

---

[35]We discuss Calvert's jury charge complaints below.

included a lesser-included offense of theft and instructions on the presumption of innocence, the standard for the State's burden of proof, the privilege against self-incrimination, the law of parties, and the standard for accomplice testimony, and it informed the jury as follows with regard to extraneous offenses:

> You are instructed if there is any testimony before you in this case regarding the defendant's having committed offenses other than the offense alleged against him in the indictment in this case, you cannot consider said testimony for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offenses, if any were committed, and even then you may only consider the same in determining the motive, intent, preparation, plan, or knowledge of the defendant, if any, in connection with the offense, if any, alleged against him in the indictment in this case, and for no other purpose.

After the trial judge read the charge to the jury, during closing arguments, the prosecutor reminded the jury that argument was not evidence and then said that the evidence showed that Calvert was not the thief but that his friends were. She stated that although defense counsel said that the State had dug up its witnesses "in the mud," that "actually, [the State had] just [gone] to [Calvert's] address book . . . because these are the people that he hangs with." She credited Calvert with being smart enough to let others bear most of the risk of getting caught and that he was the common denominator.

The prosecutor mentioned some of the extraneous evidence, stating,

> [Y]'all saw so much property inside [Calvert's] residence where he lived, around the outside of his residence, that there is absolutely no way that an individual could be in that area and not know that something was not

49

on the up and up. *You just don't keep, you know, two air compressors on your kitchen floor.* [Emphasis added.]

But she also talked about how although the accomplices "all minimized [their involvement] to some extent," she also thought that they had told the truth to some extent. The prosecutor referenced the DNA evidence that tied Calvert to the truck box found on Pioneer Trail and the photographs on Calvert's phone, and she pointed out to the jury that the State had abandoned the portion of the charge on the bait trailer after Perrin testified that he had committed the bait trailer theft on his own. She reminded the jury that Huebner had said that Calvert had lost his formal job before Christmas, which was around the same time that the thefts had occurred. And she argued that there was "no way that [Calvert] couldn't know, didn't direct, didn't encourage, didn't aid all these folks to do whatever he wanted them to do. He needed money. He needed the dope. These folks helped him."

Defense counsel reminded the jury that he had told them in his opening statement that Calvert did not steal anything and "that is essentially what the State just conceded." And he argued that there was no evidence that Calvert had told Perrin to steal anything or aided, encouraged, or solicited him to do so and that Perrin had worked alone. Defense counsel reminded the jury that when he had asked the investigators during cross-examination whether there were any messages that showed any kind of communication between Calvert and anybody else in which he had encouraged, directed, solicited, or aided them in stealing, they had admitted that there

50

were none.  He reminded them that merely being present for an offense was not enough to make one a party to a crime and contended that the Ford F-550 photos merely showed Calvert's presence.  He also argued that there was no proof of any profits.

Defense counsel also reminded the jury that as to the extraneous offense evidence, the investigators had admitted that they did not know what was stolen, stating,

> The State showed you picture after picture after picture after picture of all this property, but think about what they said for the vast majority of every picture they put up there:  We can't say whether this was stolen or not.  We can't say whether this was stolen or not.  We can't say whether this was stolen or not.  We can't say whether this was stolen or not.
>
> Masters and Cox, the investigators, both said: We can't say.  Picture after picture after picture after picture, but they can't say, you know, because they never went through the shoebox.  They never bothered to go through the shoebox that my client brought them to show you the receipts and stuff they had.  But the State still wants you to believe and they want to say that: Well, this is -- this is -- this is proof.  Here's the proof.  Look at all the property he had around him.

Calvert's counsel encouraged the jury to go through the shoebox of receipts.

Calvert's counsel also argued that there was no clear evidence of how NSP's truck and freight box made it from NSP's facility to the Hill and that along with all of the other questions he had raised about the case, a "not guilty" verdict was the answer because "[w]hen we have lots of 'we don't knows,' we have reasonable doubt."  And he reminded the jury about testimony that "dopers lie" and asserted that Dearman was the biggest doper in the case and untrustworthy, that Stephenson was a liar, and

51

that Morgan could not have been a substitute kingpin because she was disloyal and unreliable.

In rebuttal, the prosecutor responded that Calvert did not have to steal anything but rather just had to know that the property was stolen during the time it was in his possession—"[H]e had sufficient time to tear it apart; so you know he had sufficient time to give it back. When he didn't do that, then he bec[a]me[] a party." She also asserted that Calvert had run with thieves and dopers because he was a thief and a doper and that Calvert lied from the "get-go" when he denied knowing Perrin. She also encouraged the jury to consider Calvert's shoebox of receipts, stating,

> I will agree 100 percent with Defense that you should take this box of receipts in there, and you should look at it and believe that he saved his receipts. Because he did. There's receipts in here from 2014.
>
> Now, they're mainly from Chick-fil-A and other fast food restaurants, some to the movie theater; but there are some receipts in there for tools. There absolutely are. *But there is nowhere near close to the receipts of the tools that he had in his house.*
>
> . . . So absolutely, take it back and dig through every single one of them. It won't take you that long. I've done it. [Emphasis added.]

The prosecutor argued to the jury that Calvert's handwritten bills of sale for the trailers were false and unbelievable and that he had made up the story about Manuel "Herrera/Salazar." She asserted that property that is not stolen does not have missing VINs and is not being unnecessarily repainted. She stated that Calvert was the one who had broken down the items, "[a]nd if you think that is not aiding and abetting and encouraging, I don't know what is." She claimed that Calvert had received profits

52

from selling some of the property, either directly or through Young, and that the evidence established a pattern of Calvert's actions over and over.

Finally, the prosecutor told the jury to consider the individual properties listed in the indictment "because all the other stolen property didn't matter," she walked the jury through connections between Calvert and each piece of property listed in the indictment, and she reminded the jury that they needed to find only three people in the combination.

Based on the sufficiency of the evidence to convict Calvert of engaging in organized crime as to the items listed in the indictment—especially the fact that the jury had the opportunity to review the "shoebox of receipts"—as well as the trial court's limiting instruction, and the parties' arguments, we conclude that the trial court's nonconstitutional errors, if any, with regard to admitting the extraneous offense evidence did not affect Calvert's substantial rights, and we overrule this portion of his fifth point.

## VIII. Jury Charge

In his eighth point, Calvert argues that the jury charge "contained errors of omission and commission" that rendered it "fundamentally defective and unable to pass constitutional muster" and complains that "as a whole document, [it] was confusing, misleading, erroneous, inaccurate, and repugnant." We must review "all alleged jury-charge error . . . regardless of preservation in the trial court." *Kirsch v.*

53

*State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). In reviewing a jury charge, we first determine whether error occurred; if not, our analysis ends. *Id.*

Error in the charge, if timely objected to in the trial court, requires reversal if the error was "calculated to injure the rights of [the] defendant," which means no more than that there must be *some* harm to the accused from the error. Tex. Code Crim. Proc. Ann. art. 36.19; *Abdnor v. State*, 871 S.W.2d 726, 732 (Tex. Crim. App. 1994); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g); *see also Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013). In other words, a properly preserved error, unless harmless, requires reversal. *Almanza*, 686 S.W.2d at 171.

In contrast, unpreserved charge error warrants reversal only when the error resulted in egregious harm. *Nava v. State*, 415 S.W.3d 289, 298 (Tex. Crim. App. 2013); *Almanza*, 686 S.W.2d at 171; *see* Tex. Code Crim. Proc. Ann. art. 36.19. In making an egregious-harm determination, we must consider "the actual degree of harm . . . in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel[,] and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171. *See generally Gelinas v. State*, 398 S.W.3d 703, 708–10 (Tex. Crim. App. 2013) (applying *Almanza*). Errors that result in egregious harm are those "that affect the very basis of the case, deprive the defendant of a valuable right, vitally affect the defensive theory, or make a case for conviction clearly and significantly more

persuasive." *Taylor v. State*, 332 S.W.3d 483, 490 (Tex. Crim. App. 2011) (citing *Almanza*, 686 S.W.2d at 172). The purpose of this review is to illuminate the actual, not just theoretical, harm to the accused. *Almanza*, 686 S.W.2d at 174.

Calvert first complains that the prosecutor improperly added to the statutory definition of the term "collaborating in carrying on." The charge defined "combination" as "three or more people who collaborate in carrying on criminal activities, although: (1) participants may not know each other's identities; (2) membership in the combination may change from time to time; and (3) participants may stand in a wholesaler-retailer or other arm's-length relationship in illicit distribution operations." *See* Tex. Penal Code Ann. § 71.01(a) (defining "combination"). The charge defined "collaborate in carrying on" as "working together with a specified number of others in specified criminal activities. The State is not required to allege the names of the members of the group or prove the names."

There is no statutory definition of "collaborate in carrying on," *cf. id.*, but the Texas Court of Criminal Appeals has indicated that the State must prove more than that an accused committed or conspired to commit only one enumerated offense with two or more people—it must prove a *continuing* course of criminal activities. *Nguyen v. State*, 1 S.W.3d 694, 697 (Tex. Crim. App. 1999); *see also O'Brien v. State*, 544 S.W.3d 376, 384 (Tex. Crim. App. 2018) (explaining that engaging in organized crime is a "circumstances of the conduct" offense, "the circumstance being the existence or creation of a combination that collaborates in carrying out criminal activities").

55

Calvert complains that the second sentence—that the State is not required to allege the names of the members of the group or prove the names—should not have been included because the State actually alleged the names and was therefore bound to prove them. This is not the same basis as his counsel's objection during trial.[36] *Cf.* Tex. R. App. P. 33.1(a). Further, because the State actually alleged and proved the names of the members of the group—Calvert, Perrin, Stephenson, Sampley, Jacobson, Morgan, and Bates—even if it was not required to do so, and because the application portion of the charge specifically addressed all of these individuals, the error was harmless on its face. This is because including a merely superfluous abstract instruction never produces reversible charge error; it has no effect on the jury's ability to fairly and accurately implement the commands of the application paragraph or paragraphs. *See Plata v. State*, 926 S.W.2d 300, 302–03 (Tex. Crim. App. 1996), *overruled on other grounds by Malik v. State*, 953 S.W.2d 234 (Tex. Crim. App. 1997). We overrule this portion of Calvert's eighth point.

Calvert also complains that the charge omitted definitional paragraphs for "reasonable doubt" and "proof beyond a reasonable doubt." But the trial court need not define reasonable doubt for the jury; in fact, the better practice is not to define it at all. *See Paulson v. State*, 28 S.W.3d 570, 573 (Tex. Crim. App. 2000), *overruling in part*

---

[36]During the charge conference, Calvert's counsel stated, "[W]e're going to object on Page 1 to the definition of "collaborating" and "carrying on." He based his objection on the lack of a statutory definition, stating, "[M]y preference would be to not have any definition there at all." The trial court overruled the objection.

*Reyes v. State*, 938 S.W.2d 718 (Tex. Crim. App. 1996), *and Geesa v. State*, 820 S.W.2d 154 (Tex. Crim. App. 1991). Failing to give the jury such a definition is therefore not reversible error. *Id.* Accordingly, we overrule this portion of Calvert's eighth point.

Calvert also argues that the extraneous offense instruction was incomplete and insufficient because it did not address the photographs of tools "portrayed as likely stolen, when in fact the receipts were in the prosecution[']s possession all along" or refer to the allegations about drug dealing and drug use. We have already set out the charge's extraneous offense instruction in our discussion of Calvert's fifth point. That broad instruction allowed the jury to consider any extraneous offenses demonstrated by the evidence and to determine whether the State had proved those offenses beyond a reasonable doubt, and it limited the jury's consideration of those offenses to determining only Calvert's motive, intent, preparation, plan, or knowledge as to the engaging-in-organized-crime offense. *See* Tex. Code Crim. Proc. Ann. art. 36.14 (requiring the trial court to deliver a written charge setting forth the law applicable to the case and to not express any opinion as to the weight of the evidence, summarize the testimony, or discuss the facts). In contrast, a jury instruction that conveys some opinion on the weight of the evidence—by singling out that evidence and inviting the jury to pay particular attention to it—could violate Article 36.14. *Brown v. State*, 122 S.W.3d 794, 801 (Tex. Crim. App. 2003); *see also Walters*, 247 S.W.3d at 214 ("The trial court in this case . . . properly left it to the advocates to argue the significance of each specific piece of evidence."). Accordingly, we hold that the trial court did not err by

57

not listing specific pieces of evidence in the extraneous-offense instruction, and we overrule this portion of Calvert's eighth point.

Calvert also argues that the accomplice-witness instruction paragraphs were incomplete and inaccurate because they failed to instruct on "accomplice-on-accomplice corroboration."

The charge's accomplice witness instructions stated,

> You are instructed that an Accomplice, as the term is hereinafter used, means any person connected with the crime charged, as a party thereto, and includes all persons who are connected with the crime, as such parties, by unlawful act or omission on their part transpiring either before or during the time of the commission of the offense. A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both. Mere presence alone, however, will not constitute . . . a party to an offense.

> You are further instructed that a conviction cannot be had upon the testimony of an accomplice unless the jury first believes that the accomplices' evidence is true and shows that the defendant is guilty of [the] offense charged in the Indictment, and then you cannot convict the defendant upon said testimony unless you further believe that there is other testimony in the case, outside the testimony of the said witnesses, tending to show the commission of the alleged offense by the defendant, Patrick Birch Calvert, if he did. The corroboration, if any, is not sufficient if it merely shows the commission of the offense, but it must tend to connect the defendant with its commission, and even then, before you can convict the defendant, you must believe, from the evidence beyond a reasonable doubt that the defendant is guilty of the offense charged against him.

> Now, if you find that there are accomplices, if any, then you cannot convict on their testimony unless you first believe that the accomplice's testimony is true and that it shows the defendant is guilty of the offense charged against him, and even then you cannot convict

58

unless the accomplice's testimony is corroborated by other evidence tending to connect the defendant with the offense charged.

*See* Tex. Code Crim. Proc. Ann. art. 38.14 (setting forth corroboration requirement for accomplice testimony).

While "it is a fundamental principle that the testimony of one accomplice witness cannot corroborate another accomplice witness' testimony," *Chapman v. State*, 470 S.W.2d 656, 660 (Tex. Crim. App. 1971), the record does not reflect any egregious harm to Calvert because of the failure to include this principle in the jury charge. The record reflects that all of the accomplices listed in the indictment tried to minimize their individual involvement and that most of their evidence tended to corroborate evidence that the investigators had independently discovered over the course of the case. Accordingly, we overrule this portion of Calvert's eighth point.

Calvert further argues that the charge omitted a statutorily required instruction under Penal Code Section 71.02 to unanimously find him guilty of one of the enumerated offenses as a prerequisite to finding him guilty of engaging in organized criminal activity and that an additional theory of appropriation, defining a separate offense from that which was listed in the indictment, was included in the charge.

Penal Code Section 71.02(a) states that a person commits an offense "if, with the intent to establish, maintain, or participate in a combination or in the profits of a combination . . . , the person commits or conspires to commit one or more" of a

nineteen-item list. Tex. Penal Code Ann. § 71.02(a)(1)–(19). Theft is contained in the first item. *Id.* § 71.02(a)(1).

The indictment charged Calvert with unlawfully appropriating, by acquiring or otherwise exercising control over (i.e., through the theft of) seven items through a scheme or continuing course of conduct, to reach an aggregate property value of $30,000 to $150,000, with the intent to establish, maintain, or participate in a combination or in the profits of a combination that consisted of Perrin, Stephenson, Sampley, Jacobson, Morgan, or Bates, who collaborated in carrying on said criminal activity. *See id.* § 31.03(a) (defining theft as the unlawful appropriation of property with intent to deprive the owner thereof). The jury charge defined unlawful appropriation and instructed the jury that if they found from evidence beyond a reasonable doubt that Calvert had unlawfully appropriated the seven items "by acquiring or otherwise exercising control over" them—each item listed in the conjunctive with a date, the item, its owner, and its value—with the intent to establish, maintain, or participate in a combination or in the profits of a combination consisting of Perrin, Stephenson, Sampley, Jacobson, Morgan, or Bates, who collaborated in carrying on said criminal activity, then it would find Calvert guilty of the offense. The immediately following paragraph stated that if the jury acquitted Calvert of the engaging-in-organized-crime offense, it was then to consider the lesser-included predicate offense of theft. In the last paragraph of the jury charge, the jury was instructed that its verdict "must be unanimous." *Cf. O'Brien*, 544 S.W.3d at 379

60

("We hold that the commission of each predicate crime constitutes a different manner and means of committing the single offense of engaging in organized criminal activity.").

Because the charge does not omit any statutorily required instruction under Section 71.02—to the contrary, by charging the predicate items in the conjunctive and requiring unanimity, the charge added to the State's burden—and because the "additional theory of appropriation" appears to merely reference the lesser-included offense,[37] which was not reached by the jury, there is no error here, and we overrule the remainder of Calvert's eighth point.

## IX. Prosecutorial Misconduct

In part of his fifth point and in his sixth point, Calvert asserts that the prosecutor knowingly used false evidence and elicited perjury during the trial, identifying "numerous instances of falsely portraying [his] tools as stolen when they had the receipts." He also complains that the prosecutor ignored her duty of due diligence in bringing the case to trial when he was held for 29 months on two charges

---

[37]In his reply brief, Calvert asserts that part of his complaint is that the abstract portion of the charge contained two definitions of "appropriation." The abstract portion of the charge defined "appropriate" as "to a) bring about a transfer or purported transfer of title to other nonpossessory interest in property, whether to the actor; or another or b) to acquire or otherwise exercise control over property other than real property." Because the application portion of the charge set forth the same language set out in the indictment—"acquiring or otherwise exercising control over," the inclusion of this superfluous definition was harmless. *See Plata*, 926 S.W.3d at 302–03.

that, at a maximum, would carry only 24 months of incarceration; that the prosecutor overwhelmingly used hearsay during opening statements and closing arguments; that the prosecutor engaged in selective and vindictive prosecution; and that the prosecutor threatened and coached the witnesses.

Because at no point during the trial did Calvert raise any objections based on prosecutorial misconduct, he has failed to preserve these complaints for our review. *See generally Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012) (explaining preservation-of-error requirement); *Dusenbery v. State*, No. 02-16-00125-CR, 2018 WL 4025078, at *11 (Tex. App.—Fort Worth Aug. 23, 2018, pet. ref'd) (mem. op., not designated for publication) (holding that appellant forfeited his complaints about prosecutorial misconduct when he failed to preserve them). Furthermore, the record does not reflect pervasive prosecutorial misconduct, i.e., an aggregation of "serious and continuing prosecutorial misconduct that undermine[d] the reliability of the factfinding process." *See Bautista v. State*, 363 S.W.3d 259, 263 (Tex. App.—San Antonio 2012, no pet.). Accordingly, we overrule Calvert's sixth point and the pertinent portion of his fifth point.

## X. Ineffective Assistance of Counsel

In his first and seventh points, and in parts of his fourth and fifth points, Calvert complains that he received ineffective assistance of counsel before, during, and after his trial.

The Sixth Amendment guarantees a criminal defendant the effective assistance of counsel. *Ex parte Scott*, 541 S.W.3d 104, 114 (Tex. Crim. App. 2017); *see* U.S. Const. amend. VI. To establish ineffective assistance, an appellant must prove by a preponderance of the evidence that his counsel's representation was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *Nava*, 415 S.W.3d at 307. The record must affirmatively demonstrate that the claim has merit. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).

In evaluating counsel's effectiveness under the deficient-performance prong, we review the totality of the representation and the particular circumstances of the case to determine whether counsel provided reasonable assistance under all the circumstances and prevailing professional norms at the time of the alleged error. *See Strickland*, 466 U.S. at 688–89, 104 S. Ct. at 2065; *Nava*, 415 S.W.3d at 307; *Thompson*, 9 S.W.3d at 813–14. Our review of counsel's representation is highly deferential, and we indulge a strong presumption that counsel's conduct was not deficient. *Nava*, 415 S.W.3d at 307–08.

Further, an appellate court may not infer ineffective assistance simply from an unclear record or a record that does not show why counsel failed to do something. *Menefield v. State*, 363 S.W.3d 591, 593 (Tex. Crim. App. 2012); *Mata v. State*, 226 S.W.3d 425, 432 (Tex. Crim. App. 2007). Trial counsel "should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective."

*Menefield*, 363 S.W.3d at 593. If trial counsel did not have that opportunity, we should not conclude that counsel performed deficiently unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *Nava*, 415 S.W.3d at 308. Direct appeal is usually inadequate for raising an ineffective-assistance-of-counsel claim because the record generally does not show counsel's reasons for any alleged deficient performance. *See Menefield*, 363 S.W.3d at 592–93; *Thompson*, 9 S.W.3d at 813–14.

With regard to ineffective assistance of appellate counsel, generally brought in an application for writ of habeas corpus, *see, e.g.*, *Ex parte Miller*, 330 S.W.3d 610, 613 (Tex. Crim. App. 2009), the habeas applicant must show that counsel's decision not to raise a particular point of error was objectively unreasonable and that there is a reasonable probability that, but for counsel's failure to raise that particular issue, he would have prevailed on appeal. *Ex parte Flores*, 387 S.W.3d 626, 639 (Tex. Crim. App. 2012). An appellate attorney need not advance every argument, regardless of merit, urged by the appellant, but if appellate counsel fails to raise a claim that has indisputable merit under well-settled law and would necessarily result in reversible error, appellate counsel is ineffective for failing to raise it. *Id.*; *see Miller*, 330 S.W.3d at 626 (concluding that because the habeas applicant received ineffective assistance from his appellate counsel, "[t]he proper remedy . . . is to return the applicant to the point at which he can give notice of appeal").

In his first point, Calvert argues that his former appellate counsel's August 1, 2018 motion for new trial and motion in arrest of judgment allege "a set of facts that are diametrically opposed to the truth"[38] and lists as viable reasons that could have been used in a motion for new trial the following: (1) erroneous admission of extraneous offense evidence; (2) trial counsel's refusal to file a motion to suppress; (3) prosecutorial misconduct; (4) various errors in the jury charge; or (5) "other viable reasons under TRAP 21.3(a), (b), (d), (e), or (h)."[39] He also complains that because he "lost all faith in any counsel that has been appointed by the 43rd District Court," he was forced to proceed pro se.

The trial court signed the judgment of conviction, discharged Calvert's trial counsel, and appointed appellate counsel for him on July 16, 2018. Calvert's appointed appellate counsel timely filed a notice of appeal on August 1, 2018, and on August 2, 2018, his appointed appellate counsel filed a combined motion for new trial and motion in arrest of judgment and filed requests for free clerk's and reporter's

---

[38]While Calvert's appointed appellate counsel inaccurately stated in the motion for new trial that Calvert had waived a jury trial and had proceeded to a bench trial, she also stated that the verdict (i.e., a jury) was contrary to the law and evidence.

[39]These subsections of Rule 21.3 provide that the defendant must be granted a new trial if: he has been denied counsel; the trial court has misdirected the jury about the law or has committed some other material error likely to injure the defendant's rights; a juror has been guilty of corrupt conduct; evidence tending to establish the defendant's innocence has been intentionally destroyed or withheld, thus preventing its production at trial; and the verdict is contrary to the law and the evidence. Tex. R. App. P. 21.3(a), (b), (d), (e), (h).

records. The trial court denied the motion for new trial and granted the requests for the record on August 3, 2018. On August 17, 2018, Calvert mailed a letter to this court seeking to proceed pro se, and we abated the appeal for the trial court to conduct a hearing on his request.

In the motion for new trial, Calvert's appointed appellate counsel stated that the verdict was contrary to the law and the evidence, *see* Tex. R. App. P. 21.3(h), and that the trial court had discretion to grant a new trial in the interest of justice. While Calvert's appointed appellate counsel did not raise ineffective assistance of trial counsel in the motion, thus depriving Calvert of the opportunity to develop a record on that issue, or any of the other issues Calvert claims could have been raised, the record reflects that counsel lacked the clerk's and reporter's records necessary to identify any of these items as potential issues to be raised: the clerk's record was filed on October 29, 2018, and the reporter's record was filed on November 20, 2018. By that time, Calvert had already begun representing himself. Because his appointed appellate counsel was removed before she had the opportunity to review the appellate record and identify any arguable issues for the appeal, there is nothing for us to review. *See Flores*, 387 S.W.3d at 639; *Miller*, 330 S.W.3d at 626. We overrule Calvert's first point.

In part of his fourth and seventh points, Calvert complains that he was denied effective assistance of counsel in the pretrial process with regard to his speedy trial complaint and his counsel's failure to contact him and investigate his case "to any

extent." Calvert had five different trial counsel; he does not identify which allegedly failed him. And although, as noted above, Calvert's speedy trial complaint was not preserved for appeal, the record is insufficient to explain how Calvert's various trial attorneys were ineffective. The record does, however, reflect that three of Calvert's appointed attorneys filed motions for appointment of an investigator and that the trial court granted two of those motions, showing that his case was investigated to some extent. We overrule the remainder of Calvert's fourth point and this portion of his seventh point.

In part of his fifth point and in part of his seventh point, Calvert identifies "acts of omission and commission" that he claims rendered his trial counsel's assistance ineffective. But because the record does not reflect why Calvert's various appointed trial attorneys either acted or failed to act as they did over the course of the case, *see Menefield*, 363 S.W.3d at 593, and because we may not infer ineffective assistance from such a record, *see id.*, we must overrule the remainder of his fifth and seventh points as well.

## XI. Conclusion

Having overruled all of Calvert's points, we affirm the trial court's judgment.

/s/ Bonnie Sudderth
Bonnie Sudderth
Chief Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: September 3, 2020